# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

SEALED
BY COURT ORDER

V.

CR 16 - 0227 SI

BTC-E, A/K/A CANTON BUSINESS CORPORATION
and ALEXANDER VINNIK,

DEFENDANT(S).

---

# SUPERSEDING INDICTMENT

18 U.S.C. § 1960 - Operation of an Unlicensed Money Service Business;
18 U.S.C. § 1956(h) - Conspiracy to Commit Money Laundering;
18 U.S.C. § 1956(a)(1) - Money Laundering;
18 U.S.C. § 1957 - Unlawful Monetary Transactions; and
18 U.S.C. §§ 982(a)(1) - Criminal Forfeiture

---

A true bill.

_____
                        Foreman

Filed in open court this ___17th___ day of

___January, 2017___

_____

SALLIE KIM
United States Magistrate Judge

Clerk

Bail, $ _____

_____

NO BAIL WARRANT
for Alexander Vinnik

NO PROCESS for BTC-E

6-MTR

AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT

☒ SUPERSEDING

## OFFENSE CHARGED

18 U.S.C. § 1960 - Operation of an Unlicensed Money Service Business; 18 U.S.C. § 1956(h) - Conspiracy to Commit Money Laundering; 18 U.S.C. § 1956(a)(1) - Money Laundering; 18 U.S.C. § 1957 - Unlawful Monetary Transactions; and 18 U.S.C. §§ 982(a)(1) - Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:   Please see attachment.

**SEALED BY COURT ORDER**

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### DEFENDANT - U.S

▶ BTC-E, A/K/A CANTON BUSINESS CORPORATION

DISTRICT COURT NUMBER

CR 16-00227 SI

**FILED**

JAN 17 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Internal Revenue Service

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form   BRIAN J. STRETCH

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   WILLIAM FRENTZEN

## DEFENDANT

### IS *NOT* IN CUSTODY

Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

### IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

☐ Federal   ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   ☐ Yes   ☐ No

If "Yes" give date filed

DATE OF ARREST ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶   Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: _____

If Summons, complete following:

☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

## ATTACHMENT TO PENALTY SHEET

## BTC-E, A/K/A CANTON BUSINESS CORPORATION

COUNT ONE:      (18 U.S.C. §1960 – Operation of an Unlicensed Money Service Business)

5 years imprisonment


COUNT TWO:      (18 U.S.C. § 1956(h) – Conspiracy to Commit Money Laundering)

Not more than 20 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment


COUNTS THREE THROUGH NINETEEN:      (18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) - Money Laundering)

Not more than 20 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment


COUNTS TWENTY THROUGH TWENTY-ONE:  (18 U.S.C. § 1957 – Engaging in Unlawful Monetary Transactions)

Not more than 10 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment.


FORFEITURE ALLEGATION:      (18 U.S.C. §§ 982(a)(1) – Criminal Forfeiture)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT
☒ SUPERSEDING

---

## OFFENSE CHARGED

18 U.S.C. § 1960 - Operation of an Unlicensed Money Service Business; 18 U.S.C. § 1956(h) - Conspiracy to Commit Money Laundering; 18 U.S.C. § 1956(a)(1) - Money Laundering; 18 U.S.C. § 1957 - Unlawful Monetary Transactions; and 18 U.S.C. §§ 982(a)(1) - Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Please see attachment.

SEALED
BY COURT ORDER

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### DEFENDANT - U.S

► ALEXANDER VINNIK

DISTRICT COURT NUMBER

CR 16-00227 SI

FILED
JAN 17 2017
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Internal Revenue Service

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person Furnishing Information on this form    BRIAN J. STRETCH

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    WILLIAM FRENTZEN

---

### DEFENDANT

#### IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ►_____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

#### IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes    If "Yes" give date filed
been filed? ☐ No

DATE OF ARREST ►    Month/Day/Year
_____

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED ►    Month/Day/Year
TO U.S. CUSTODY
_____

☐ This report amends AO 257 previously submitted

---

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:    Before Judge:

Comments:

# ATTACHMENT TO PENALTY SHEET

## ALEXANDER VINNIK

COUNT ONE:            (18 U.S.C. §1960 – Operation of an Unlicensed Money Service Business)

5 years imprisonment


COUNT TWO:            (18 U.S.C. § 1956(h) – Conspiracy to Commit Money Laundering)

Not more than 20 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment


COUNTS THREE THROUGH NINETEEN:            (18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) - Money Laundering)

Not more than 20 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment


COUNTS TWENTY THROUGH TWENTY-ONE:   (18 U.S.C. § 1957 – Engaging in Unlawful Monetary Transactions)

Not more than 10 years imprisonment; not more than $500,000 fine or twice the value of the property involved in the transaction, whichever is greater; not more than 3 years of supervised release; and a $100 special assessment.


FORFEITURE ALLEGATION:            (18 U.S.C. §§ 982(a)(1) – Criminal Forfeiture)

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2

3

4

5

6                    <span style="color:red">SEALED</span>
               <span style="color:red">BY COURT ORDER</span>
7

8             UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION



| | |
|---|---|
| 11  UNITED STATES OF AMERICA, | )  UNDER SEAL |
| 12       Plaintiff, | )<br>)  CASE NO.    CR 16-00227 SI |
| 13    v. | )  VIOLATIONS: 18 U.S.C. § 1960 – Operation of an |
| 14  BTC-E, A/K/A CANTON BUSINESS<br>CORPORATION, | )  Unlicensed Money Service Business; 18 U.S.C.<br>)  § 1956(h) – Conspiracy to Commit Money<br>)  Laundering; 18 U.S.C. § 1956(a)(1) – Money |
| 15  and | )  Laundering; 18 U.S.C. § 1957 – Unlawful Monetary<br>)  Transactions; 18 U.S.C. § 982(a)(1) – Criminal |
| 16  ALEXANDER VINNIK. | )  Forfeiture<br>) |
| 17       Defendants. | )  SAN FRANCISCO VENUE<br>) |
| 18 | ) |

19                S U P E R S E D I N G   I N D I C T M E N T

20       The Grand Jury charges:

21                 INTRODUCTORY ALLEGATIONS

22       At all times relevant to this Indictment:

23       1.      Since at least approximately 2011 through and including the present, both dates being

24  approximate and inclusive, the defendant BTC-e operated as one of the world's largest and most widely

25  used digital currency exchanges.  Since its inception, BTC-e processed several billion dollars worth of

26  monetary exchanges.  BTC-e was an exchange for cybercriminals worldwide, and one of the principal

27  entities used to launder and liquidate criminal proceeds from digital currencies, including Bitcoin, to fiat

28

currencies,[1] including U.S. dollars, Euros, and Rubles. At all relevant times, the defendant ALEXANDER VINNIK, together with individuals known and unknown, directed and supervised BTC-e's operations and finances.

2.      BTC-e was an international money-laundering scheme that, by virtue of its business model, catered to criminals – and to cybercriminals in particular. Through VINNIK's efforts, BTC-e emerged as one of the principal means by which cyber criminals around the world laundered the proceeds of their illicit activity. BTC-e facilitated crimes, including computer hacking and ransomware, fraud, identity theft, tax refund fraud schemes, public corruption, and drug trafficking.

3.      BTC-e lacked basic anti-money laundering controls and policies and, as such, was attractive to those who desired to conceal criminal proceeds as it made it more difficult for law enforcement to trace and attribute funds.

4.      Since its founding, BTC-e received criminal proceeds of numerous computer intrusions and hacking incidents, ransomware scams, identity theft schemes, corrupt public officials, and narcotics distribution rings. Among other things, BTC-e accounts received substantial proceeds from the hack of the now-defunct Mt. Gox digital currency exchange and also received a substantial portion of the criminal proceeds from one of the largest ransomware schemes, CryptoWall.

5.      As described further below, the defendants and their co-conspirators, including those known and unknown to the Grand Jury, intentionally created, structured, and operated BTC-e as a criminal business venture, one designed to help criminals launder their proceeds and one they themselves used to launder criminal proceeds. The defendants thus attracted and maintained a customer base that was heavily reliant on criminals.

6.      Despite doing substantial business in the United States, BTC-e was not registered as a

---

[1] Fiat currency is simply a currency established by government regulation or law, e.g. U.S. Dollars, Euros, Japanese Yen, British Pounds, Russian Rubles, Chinese RMB, etc.

2

money services business with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), as federal law requires. As described further below, BTC-e had no meaningful anti-money laundering processes in place and lacked an effective anti-money laundering program, as federal law also requires.

7. This was in contrast to other registered digital currency exchanges that, through their anti-money laundering programs, strove to avoid having their platforms used for criminal activity. Most of those exchanges described their operations down to listing the names, photos, and backgrounds of their management, the location of their businesses, and their regulatory compliance policies.

8. BTC-e relied on the use of shell companies and affiliate entities that were similarly unregistered with FinCEN and lacked basic anti-money laundering and "Know Your Customer" policies. These entities catered to an online and worldwide customer base, and electronically "muled" fiat currency in and out of BTC-e. BTC-e's own website stated it was located in Bulgaria, yet simultaneously stated it was subject to the laws of Cyprus. Meanwhile, BTC-e's managing shell company, CANTON BUSINESS CORPORATION, was based in the Seychelles but affiliated with a Russian phone number, and its web domains were registered to shell companies in countries including Singapore, the British Virgin Islands, France, and New Zealand.

## BACKGROUND

9. Bitcoin is a form of decentralized, convertible digital currency that existed through the use of an online, decentralized ledger system.[2] Bitcoin is just one of many forms of digital currency. There are many others, including litecoin, ethers, worldcoin, and dogecoin. However, bitcoin has the largest market capitalization of any present form of decentralized digital currency.

10. While bitcoin mainly exists as an Internet-based form of currency, it is possible to "print out" the necessary information and exchange bitcoin via physical medium. The currency is not issued

---

[2] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

by any government, bank, or company, but rather is generated and controlled through computer software operating via a decentralized network. To acquire bitcoin, a typical user will purchase them from a Bitcoin seller or "exchanger." It is also possible to "mine" bitcoin by verifying other users' transactions. Bitcoin is just one form of digital currency, and there are a significant number of other varieties of digital currency.

11. Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible digital currencies. When a user wishes to purchase bitcoin from an exchanger, the user will typically send payment in the form of fiat currency, often via bank wire or ACH, or other convertible digital currency to an exchanger, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, often for a commission, will then typically attempt to broker the purchase with another user of the exchange that is trying to sell bitcoin, or, in some instances, will act as the seller itself. If the exchanger can place a buyer with a seller, then the transaction can be completed.

12. When a user acquires bitcoin, ownership of the bitcoin is transferred to the user's bitcoin address. The bitcoin address is somewhat analogous to a bank account number, and is comprised of a case-sensitive string of letters and numbers amounting to a total of 26 to 35 characters. The user can then conduct transactions with other Bitcoin users, by transferring bitcoin to their bitcoin addresses, via the Internet.

13. Little to no personally identifiable information about the payer or payee is transmitted in a bitcoin transaction itself. Bitcoin transactions occur using a public key and a private key. A public key is used to receive bitcoin, and a private key is used to allow withdrawals from a bitcoin address. Only the bitcoin address of the receiving party and the sender's private key are needed to complete the transaction. These two keys by themselves rarely reflect any identifying information.

14. All bitcoin transactions are recorded on what is known as the blockchain. This is essentially a distributed public ledger that keeps track of all bitcoin transactions, incoming and outgoing, and updates approximately six times per hour. The blockchain records every bitcoin address that has ever received a bitcoin and maintains records of every transaction for each bitcoin address.

15. Digital currencies, including bitcoin, have many known legitimate uses. However, much

4

like cash, bitcoin can be used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which bitcoin can be used to move funds with high levels of anonymity. As is demonstrated herein, however, in some circumstances bitcoin payments may be effectively traced by analyzing the blockchain.

BTC-E OVERVIEW

16.     BTC-e was founded in or about 2011. In the years it operated, BTC-e has served approximately 700,000 users worldwide, including numerous customers in the United States and customers in the Northern District of California. BTC-e touts itself as "a platform for individuals interested in buying and selling bitcoin using an assortment of world currencies;" in other words, a digital currency exchange.

17.     Through the work of VINNIK and others known and unknown to the Grand Jury, BTC-e became one of the primary ways by which cybercriminals around the world transferred, laundered, and stored the criminal proceeds of their illegal activities. U.S. dollars and Russian rubles were the most frequently exchanged fiat currencies on the platform, while Bitcoin and litecoin were the most widely exchanged digital currencies.

18.     Because such a significant portion of BTC-e's business was derived from suspected criminal activity and given its global reach, the scope of the defendants' unlawful conduct was massive. During the relevant timeframe from 2011 to December 30, 2016, bitcoin addresses associated with BTC-e had received over 9.4 million bitcoin. Bitcoin's rapidly fluctuating exchange rate makes it difficult to determine the U.S. Dollar value of this quantity of bitcoin over time. However, using today's bitcoin exchange rate, the total value of bitcoin received by BTC-e over the course of its operation would be valued at over $9 billion. In 2016 alone, BTC-e received over 1.8 million bitcoin, valued at over $1.7 billion at today's exchange rate.[3]

---

[3] This is calculated using the December 30, 2016 bitcoin trading value of approximately $962 per bitcoin. Since August 2011, the Bitcoin market price has fluctuated from a low of roughly $2 to a high

5

19.     Notably, the above figures only include bitcoin exchanged on the BTC-e platform and do not even include the deposits and withdrawals made in other digital currencies, such as litecoin, nor do these figures take into account well over a billion dollars' worth of what is known as "BTC-e code." BTC-e code enabled a BTC-e user to send and/or receive fiat currencies and digital currencies to other BTC-e users.

20.     BTC-e maintained its servers in the United States.  The servers were one of the primary ways in which BTC-e and the defendants effectuated their operations.  BTC-e also used many third-party companies, including companies within the Northern District of California, to effectuate their operations and enable them to function.

21.     At its inception, BTC-e was one of a number of digital currency exchanges.  It was engaged in the same line of business as other online digital currency exchanges in existence at the time, including Liberty Reserve.  Liberty Reserve was a Costa Rica-based centralized digital currency service that laundered approximately $6 billion in criminal proceeds.  It was shuttered in 2013 when its founder and six other individuals were charged with conspiracy to commit money laundering and with operating an unlicensed money transmitting business.  Liberty Reserve's website was seized by the U.S. government.[4]

22.     There was an overlap between many Liberty Reserve users and BTC-e users.  BTC-e itself was a user of Liberty Reserve.

23.     Another digital currency exchange in operation between 2011 and 2014 was the MTGOX Exchange ("Mt. Gox") that was originally founded in San Francisco, but ultimately based in Tokyo, Japan.  In 2014, Mt. Gox collapsed, having been the target of a series of major intrusions that resulted in thefts totaling several hundred million dollars worth of bitcoin.  In 2014, Mt. Gox filed for bankruptcy in

---

of approximately $1200 per bitcoin and has varied dramatically over time..

[4] MAYZUS, through its predecessor, UWC FINANCIAL SERVICES, also served as an exchanger for Liberty Reserve.

Japan.

24.     After the collapse of Liberty Reserve, and with the intrusions and accompanying issues that Mt. Gox experienced, BTC-e rapidly grew. The volume of transactions it performed and its number of users expanded, filling the vacuum left by entities like Liberty Reserve and Mt. Gox.

## ENTITIES AND INDIVIDUALS

25.     As described further below, BTC-e's money laundering operation was partially enabled and supported by MAYZUS FINANCIAL LTD. a/k/a MAYZUS INVESTMENT COMPANY ("MAYZUS"). MAYZUS enabled a mechanism of moving money internationally centered principally on a core of companies owned by a Russian national. MAYZUS used to be known as UWC FINANCIAL SERVICES ("UWC"), but following the seizure and shuttering of another digital currency exchange, Liberty Reserve, UWC rebranded itself as MAYZUS FINANCIAL LTD.

26.     MAYZUS offered a wide range of currency exchange services and provided the ability for fiat currency to be sent – through two online affiliates – to and from BTC-e. BTC-e utilized MAYZUS in lieu of a bank account.

27.     MONEY POLO was an online payments system and affiliate of MAYZUS. MONEY POLO was registered in the British Virgin Islands with ties to Cyprus. In order to fund a MONEY POLO account, a user transferred funds to MAYZUS for the benefit of a specific MONEY POLO account number. A MONEY POLO account, in turn, was one of the mechanisms that could be used to fund a BTC-e account.

28.     MAYZUS and MONEY POLO enabled BTC-e's operation and its business. Like BTC-e, neither MAYZUS nor MONEY POLO was registered as money service businesses with the United States Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). In or about March 2016, Cyprus's Securities and Exchange Commission fined MAYZUS in connection with legal and regulatory violations stemming from lax anti-money laundering policies.

29.     CANTON BUSINESS CORPORATION ("CANTON") was a shell corporation used as a

front for BTC-e's operations. Like BTC-e, CANTON was not registered with FinCEN. Financial and other records demonstrate that CANTON was synonymous with BTC-e. VINNIK, a Russian national, was a primary beneficial owner of CANTON's financial accounts. Although CANTON's listed business address was in the Seychelles, it operated using a Russian telephone number.

30.     VINNIK also operated and controlled multiple BTC-e accounts, including a BTC-e account known as the "WME" account. The "WME" account was tied directly to BTC-e administrator accounts. Numerous withdrawals from BTC-e administrator accounts went directly to bank accounts tied to VINNIK.

31.     Another such administrator account associated with VINNIK was the "Vamnedam"[5] account. The "Vamnedam" account was directly linked to the BTC-e administrative, financial, operational and support accounts, accounts to which only those involved in the operations of the BTC-e enterprise would have had access. Proceeds from well-known hacks and thefts from bitcoin exchanges and users around the world funded the Vamnedam account. Out of the Vamnedam account, large payments were made to accounts associated with VINNIK and others known and unknown to the Grand Jury, including a Russian national hereafter referred to as unindicted CO-CONSPIRATOR X, who is alleged to have access to the Vamnedam account.

## BTC-E FUNCTION

32.     To use BTC-e, one created an account by accessing the BTC-e website. A user did not need to provide even the most basic identifying information such as name, date of birth, address, or other identifiers. All that BTC-e required was a username, password, and an email address. Unlike legitimate payment processors or digital currency exchangers, BTC-e did not require its users to validate their identity information by providing official identification documents, given that BTC-e did not require an identity at all.

---

[5] Vamnedam means "I will not give it to you" in Russian.

33.     Thus, a user could create a BTC-e account with nothing more than a username and email address, which often bore no relationship to the identity of the actual user. Accounts were therefore easily opened anonymously, including by customers in the United States within the Northern District of California.

34.     At all times relevant to this Indictment, BTC-e had no anti-money laundering and/or "Know-Your-Customer" (KYC) processes and policies in place. As discussed above, BTC-e collected virtually no customer data at all. Nor did BTC-e or its shell companies ever register with FinCEN or perform these functions on BTC-e's behalf.

35.     A user could fund a BTC-e account in numerous different ways. One way involved funding the account with fiat currency that would be converted into digital currency, such as bitcoin. With fiat currency, a user could initiate a wire transfer from a financial institution made directly for the benefit of BTC-e to an account at another financial institution, which was routed to a bank account maintained by one of BTC-e's shell or affiliated companies. A BTC-e user could also fund an account through the use of a third-party payment system, like MONEY POLO, a third-party entity that maintained a direct relationship with BTC-e. MONEY POLO accounts worked to electronically "mule" fiat currency in and out of BTC-e. Incoming fiat currency was deposited into MAYZUS accounts (using its subsidiary MONEY POLO) to transfer into BTC-e. Outgoing digital currency was exchanged and converted to fiat currency and sent through MONEY POLO accounts benefiting MAYZUS.

36.     Another way involved funding a BTC-e account with a user's existing digital currency. A user with existing digital currency, such as bitcoin, could fund a BTC-e account directly via bitcoin deposits. BTC-e users could also purchase "BTC-e code" that could be sent and exchanged amongst BTC-e users. BTC-e code enabled a BTC-e user to send and/or receive fiat currencies and digital currencies to other BTC-e users. This served as another conduit for money laundering as it allowed BTC-e customers to withdraw funds from their BTC-e account and transfer them to other BTC-e users

9

anonymously.

37.     BTC-e's business model obscured and anonymized transactions and source of funds.  For example, a BTC-e user could not fund an account by directly transferring money to BTC-e itself, but rather had to wire funds to one of BTC-e's shells or affiliate entities.  Nor could BTC-e users withdraw funds from their accounts directly, such as through an ATM withdrawal.  Instead, BTC-e users were required to make any deposits or withdrawals through the use of third-party "exchangers," thus enabling BTC-e to avoid collecting any information about its users through banking transactions or other activity that would leave a centralized financial paper trail.

38.     Once a user funded an account with BTC-e, the user could then do any number of things: conduct transactions with other BTC-e users; exchange digital currency into fiat currency; or simply use BTC-e to store digital currency deposits, much like a bank.

39.     Like other digital currency exchanges, BTC-e charged transaction fees for their services.  BTC-e charged a percentage fee every time a user transferred funds held in BTC-e to another user through the BTC-e system.  In addition, BTC-e charged a percentage fee every time a user used BTC-e to exchange digital currency held in a BTC-e account into fiat currency.[6]

40.     In addition to the fees BTC-e charged, users were charged additional fees by MONEY POLO and MAYZUS, each taking a percentage of the funds exchanged.  These added fees were associated with getting money in and out of the BTC-e platform through these funding mechanisms, mechanisms that obfuscated the true sender of the currency.

41.     Those engaged in criminal activity using BTC-e gravitated to BTC-e because of the site's lack of anti-money laundering and "Know-Your-Customer" processes in place that could have them reported to the government.  Criminals who used BTC-e to launder funds were also willing to go to the extra trouble of wiring money offshore to entities that operated through shell companies.

---

[6] Likewise, MONEY POLO charged fees in addition to BTC-e's fees when transferring fiat currency in and out of BTC-e.

10

42.     BTC-e made a series of self-serving public statements, designed at least in part to deflect the attention of law enforcement and regulators. For example, despite advertising on their website that "[w]e require our clients to verify identity by providing [sic] scanned copy of ID and scanned copy of utility bill or a bank statement which should not be older then [sic] 6 month. Copy should be in good resolution and colored," this process was not in fact followed. As discussed, no customer identification whatsoever was required to set up BTC-e accounts, including BTC-e accounts set up by customers in the Northern District of California.

43.     Likewise, the BTC-e website advertised that "[w]e don't accept any more international wire transfers from US Citizens or from US Bank." This, too, was false. Through its elaborate funding mechanisms, BTC-e did in fact knowingly accept wire transfers from banks in the U.S. and made by U.S. citizens.

## BTC-E'S CRIMINAL DESIGN

44.     As described above, BTC-e's system was designed so that criminals could accomplish financial transactions with anonymity and thereby avoid apprehension by law enforcement or seizure of funds. BTC-e was in fact thus used extensively for illegal purposes, and, particularly since the collapse of entities like Mt. Gox and Liberty Reserve, it functioned as the exchange of choice to convert digital currency like bitcoin to fiat currency for the criminal world, especially by those who committed their crimes online.

45.     The defendants were aware that BTC-e functioned as a money laundering enterprise. Messages on its own forum openly and explicitly reflected some of the criminal activity in which the users on the platform were engaged, and how they used BTC-e to launder funds.

46.     BTC-e users established accounts under monikers suggestive of criminality, including monikers such as "ISIS," "CocaineCowboys," "blackhathackers," "dzkillerhacker," and "hacker4hire."

47.     This is not surprising because criminals used BTC-e to launder criminal proceeds and

transfer funds among criminal associates. In particular, it was used by hacking and computer intrusion rings operating around the world to distribute criminal proceeds of their endeavors. It was also used by rings of identity thieves, corrupt public officials, narcotics distribution networks, and other criminals.

48.     In fact, some of the largest known purveyors of ransomware used BTC-e as a means of storing, distributing, and laundering their criminal proceeds. Ransomware is a criminal scheme in which cybercriminals orchestrate the unwanted malicious download of encryption software on an unsuspecting victim computer. It works as follows: once a victim is infected with the malicious software, often by clicking on a fraudulent email, the ransomware will encrypt multiple files types on victim machines and hold those files for ransom, requiring the victim to pay the administrators of the ransomware scheme in order to have their files decrypted. Victims that pay the ransom are able to decrypt their files by using a stand-alone program provided by the ransomware administrators after the ransom payment has been made. The method of encryption implemented by the ransomware, if properly executed, renders it impossible for victims to decrypt their encrypted files in any other way. The most prevalent payment method accepted by current purveyors of ransomware is bitcoin.

49.     One such ransomware scheme, CryptoWall, was distributed by methods including fraudulent and phishing emails. CryptoWall was one of the most infamous varieties of ransomware and has infected a vast number of computers across the world. During the timeframe relevant to this Indictment, the purveyors of CryptoWall deposited and laundered many hundreds of thousands of dollars' worth of ransom payments into BTC-e.

50.     So, too, did a pair of corrupt U.S. federal agents, Carl Mark Force and Shaun Bridges, use BTC-e to launder their criminal proceeds. Their experience with the criminal underworld taught them that using BTC-e, as opposed to a registered exchange with anti-money laundering policies, would maximize their chances of being able to conceal criminal proceeds. Each therefore sent several hundred thousand dollars in criminal proceeds – derived from crimes ranging from theft of government property

to extortion – to the BTC-e platform for laundering.

51.    BTC-e also served as the receptacle and transmitter of criminal funds from a series of well-publicized computer intrusions and resulting thefts, including the well-publicized thefts from the Japan-based Mt. Gox exchange. As discussed below, a sizable portion of the stolen Mt. Gox funds were deposited into accounts controlled, owned, and operated by BTC-e and by defendant VINNIK and others known and unknown to the Grand Jury.

52.    The Mt. Gox exchange was the subject of a series of computer intrusions and resulting thefts between approximately September 2011 and May 2014, in violation of Title 18, United States Code, Section1030(a)(4). Several hundred millions dollars' worth of bitcoin was stolen, including from numerous customers in the U.S. and within the Northern District of California. After the thefts, some approximately 530,000 of the bitcoin (worth hundreds of millions of dollars) stolen from Mt. Gox was deposited into wallets at three different digital currency exchanges: (i) BTC-e; (ii) Trade Hill, another exchange based in San Francisco; and (iii) back into Mt. Gox into a different Mt. Gox wallet.

53.    Of this 530,000 bitcoin,[7] 300,000 of it was sent directly to three separate BTC-e accounts: "Vamnedam," "Grmbit," and "Petr." These accounts were all linked to each other.

54.    Meanwhile, blockchain analysis reveals that the stolen Mt. Gox funds that went to Trade Hill and back into the other Mt. Gox account were controlled by a user who also controlled a BTC-e account called "WME." At all times relevant to this Indictment, defendant VINNIK exercised control over the BTC-e "WME" account.

55.    The "Vamnedam," "Grmbit," "Petr," and "WME" accounts were each directly linked to a variety of different BTC-e administrative accounts, accounts for which only BTC-e administrators and/or operators would have had access. The "Vamnedam" account was similarly a

---

[7] The amount of bitcoin stolen from Mt. Gox accounted for just under half of the total thefts that Mt. Gox suffered.

56.     VINNIK, along with others known and unknown, controlled and operated the "Vamnedam" account.  Between approximately August 2013 and November 2015, CO-CONSPIRATOR X and identities linked to VINNIK and to BTC-e received direct payments from the "Vamnedam" account to their own personal digital currency accounts at another digital currency exchange, Bitstamp.  These bitcoin were then exchanged into fiat currency and sent to bank accounts in Cyprus and Latvia tied to VINNIK and other identities associated with VINNIK and BTC-e.

## STATUTORY ALLEGATIONS

COUNT ONE: (18 U.S.C. § 1960 – Operation of an Unlicensed Money Transmitting Business)

57.     The factual allegations in paragraphs 1 through 60 are re-alleged and incorporated herein as if set forth in full.

58.     Title 18, United States Code, Section 1960, makes it a crime to operate an unlicensed money transmitting business.  The term money transmitting includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a money transmitting business with the Secretary of the Treasury as required by a separate statute, Title 31, United States Code, Section 5330 and federal regulations pursuant to that statute.

59.     The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  See C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).

60.     From in or about 2011, up to and including in or about May 2016, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendants,

BTC-e a/k/a CANTON BUSINESS CORPORATION, and
ALEXANDER VINNIK,

and others known and unknown to the Grand Jury, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of a money transmitting business affecting interstate and foreign commerce, i.e. BTC-e, which (i) failed to comply with the money transmitting business

14

registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed pursuant to that statute, including 31 C.F.R. Sections 1010.100(ff) (5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been derived from a criminal offense and intended to be used to promote and support unlawful activity.

All in violation of Title 18, United States Code, Sections 1960 & 2.

COUNT TWO: (18 U.S.C. § 1956(h) – Conspiracy to Commit Money Laundering)

61. The factual allegations in paragraphs 1 through 60 are re-alleged and incorporated herein as if set forth in full.

62. From in or about July 2011, through in or about January 2017, both dates being approximate and inclusive, within the Northern District of California, and elsewhere, the defendants,

BTC-e a/k/a CANTON BUSINESS CORPORATION, and
ALEXANDER VINNIK,

and others known and unknown to the Grand Jury, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, operation of an unregistered money transmitting business in violation of Title 18, United States Code, Sections 1960: computer hacking and intrusions in violation of Title 18, United States Code, Section 1030; identity theft in violation of Title 18, United States Code, Section 1028; interstate transportation of stolen property in violation of Title 18, United States Code, Section 2314; theft of government proceeds and extortion in violation of Title 18, United States Code, Sections 641 and 1951; and narcotics trafficking in violation of Title 21, United States Code, Section 841; with the intent to promote the carrying on of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

All in violation of Title 18, United States Code, Section 1956(h).

COUNTS THREE THROUGH NINETEEN: (18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) – Money Laundering)

On or about the dates described below, in the Northern District of California and elsewhere, the defendant,

ALEXANDER VINNIK,

aided and abetted by others, known and unknown to the Grand Jury, did knowingly conduct and attempt to conduct the listed financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is accessing a computer in furtherance of fraud, in violation of Title 18, United States Code, Section 1030(a)(4) and (c)(3)(A), with the intent to promote the carrying on of said specified unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

| COUNT | DATE | AMOUNT (BTC) | AMOUNT (USD) | TRANSACTION |
|-------|------|--------------|--------------|-------------|
| THREE | 01/23/2012 | 90 BTC | $567.00 | Transfer of BTC into Tradehill |
| FOUR | 01/23/2012 | 83 BTC | $522.07 | Transfer of BTC into Tradehill |
| FIVE | 01/23/2012 | 61 BTC | $383.69 | Transfer of BTC into Tradehill |
| SIX | 01/24/2012 | 91 BTC | $573.30 | Transfer of BTC into Tradehill |
| SEVEN | 01/24/2012 | 90 BTC | $567.00 | Transfer of BTC into Tradehill |
| EIGHT | 01/24/2012 | 99 BTC | $623.70 | Transfer of BTC into Tradehill |
| NINE | 01/24/2012 | 533 BTC | $3,357.90 | Transfer of BTC into Tradehill |
| TEN | 01/24/2012 | 1900 BTC | $11,970.00 | Transfer of BTC into Tradehill |
| ELEVEN | 01/24/2012 | 579 BTC | $3,647.70 | Transfer of BTC into Tradehill |
| TWELVE | 01/24/2012 | 2 BTC | $12.60 | Transfer of BTC into Tradehill |
| THIRTEEN | 01/27/2012 | 1000 BTC | $5,290.00 | Transfer of BTC into Tradehill |
| FOURTEEN | 01/27/2012 | 1500 BTC | $7,935.00 | Transfer of BTC into Tradehill |
| FIFTEEN | 02/01/2012 | 1000 BTC | $5,820.00 | Transfer of BTC into Tradehill |
| SIXTEEN | 02/01/2012 | 1000 BTC | $5,820.00 | Transfer of BTC into Tradehill |
| SEVENTEEN | 02/05/2012 | 3000 BTC | $17,040.00 | Transfer of BTC into Tradehill |
| EIGHTEEN | 02/05/2012 | 500 BTC | $2,840.00 | Transfer of BTC into Tradehill |
| NINETEEN | 02/12/2012 | 2000 BTC | $11,200.00 | Transfer of BTC into Tradehill |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), (a)(1)(B)(i), and 2.

COUNTS TWENTY THROUGH TWENTY-ONE: (18 U.S.C. § 1957 – Engaging in Unlawful Monetary Transactions)

On or about the dates described below, in the Northern District of California and elsewhere, the defendant,

ALEXANDER VINNIK,

aided and abetted by others, known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the listed monetary transactions by through or to a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, that is the transactions listed below, such property having been derived from a specified unlawful activity, that is accessing a computer in furtherance of fraud, in violation of Title 18, United States Code, Section 1030(a)(4) and (c)(3)(A).

| COUNT | DATE | AMOUNT (BTC) | AMOUNT (USD) | TRANSACTION |
|-------|------|--------------|--------------|-------------|
| TWENTY | 02/05/2012 | 3000 BTC | $17,040.00 | Transfer of BTC into Tradehill |
| TWENTY-ONE | 02/12/2012 | 2000 BTC | $11,200.00 | Transfer of BTC into Tradehill |

All in violation of Title 18, United States Code, Sections 1957 and 2.

FORFEITURE ALLEGATION:    (18 U.S.C. §§ 982(a)(1) – Criminal Forfeiture)

63.    All of the allegations contained in this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).

64.    Upon a conviction for any of the offenses alleged in this Indictment, the defendants,

BTC-e a/k/a CANTON BUSINESS CORPORATION, and
ALEXANDER VINNIK,

shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1) any property, real or personal, involved in those offenses or any property traceable to such offenses including but not limited to a forfeiture money judgment.

17

If any of the aforementioned property, as a result of any act or omission of the defendants

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

any and all interest the defendant has in other property shall be vested in the United States and forfeited to the United States pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

All in violation of Title 18, United States Code, Section 982(a)(1) and Rule 32.2 of the Federal Rules of Criminal Procedure.

DATED: 1/17/17

A TRUE BILL

_____
FOREPERSON

BRIAN J. STRETCH
United States Attorney

_____
BARBARA J. VALLIERE
Chief, Criminal Division

(Approved as to form: _____
WILLIAM FRENTZEN
KATHRYN HAUN
Assistant U.S. Attorneys

INDICTMENT          18


SEALED
BY COURT ORDER

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

**Instructions:** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**
USA v. BTC-E a/k/a Canton Business Corporation and Alexander Vinnik

**CASE NUMBER:**
CR 16-00227 SI

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes ✓ | No | |
| **Total Number of Defendants:** | 1 | 2-7 ✓ | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✓ | |
| **Venue (Per Crim. L.R. 18-1):** | SF ✓ | OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✓ | |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✓ | |
| **Is this a RICO Act gang case?** | Yes | No ✓ | |

**Assigned AUSA (Lead Attorney):** William Frentzen

**Date Submitted:** 01/17/2017

**Comments:**

RESET FORM     SAVE PDF