JODI LINKER
Federal Public Defender
DAVID W. RIZK
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: 415.436.7700
Facsimile: 415.436.7706
David_Rizk@fd.org

Counsel for Defendant VINNIK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No. 16-CR-00227 SI |
|---|---|
| Plaintiff, | **DEFENDANT'S MOTION TO AMEND PROTECTIVE ORDER** |
| v. | |
| ALEXANDER VINNIK, | |
| Defendant. | |

> "The United States is outraged by the decision of a Russian court today to convict U.S. citizen Paul Whelan after a secret trial, with secret evidence, and without appropriate allowances for defense witnesses."
>
> —former U.S. Secretary of State Mike Pompeo[1]

## I. INTRODUCTION

Defendant Alexander Vinnik moves to amend the protective order in this case because it imposes unjustifiable restrictions on the defense. In particular, the protective order provides that *all* discovery—even if the government has not designated it sensitive in *any way*—may only be used by the defense (1) "in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without further order of this Court," and (2) may not be disclosed by the defense to any third parties other than witnesses. Dkt. No. 29 ¶¶ 2-3.

Both restrictions are highly unusual and not the norm in this district, especially as to discovery that is not even arguably sensitive. Although the defense vigorously objected to these restrictions when protective order was negotiated and repeatedly requested some justification for them, the government was unable or unwilling to identify any reason for them during the parties' meet and confer. Rather that delay the production of discovery by litigating the issue at that time, the defense explicitly reserved its objections and provisionally agreed to government's proposed protective order in order to receive prompt access to discovery—which the government then failed to provide for almost seven months, prompting the defense to obtain a Court order setting a deadline for discovery. (The government has now produced multiple terabytes of data in discovery and the defense is reviewing the materials.)

As a result of the protective order, however, Mr. Vinnik and the defense team are precluded from discussing any of the evidence in the case with Mr. Vinnik's family, his priest, consular officials, or the public at large. Mr. Vinnik's case is unquestionably one of significant public interest. He has been the subject of political negotiations over a prisoner swap with Russia at the highest levels of the government. That political process is unquestionably a matter of significant public interest—and, as the

---

[1] "U.S. outraged by American's espionage conviction in Russia: Pompeo," Reuters, June 15, 2020, *available at* https://www.reuters.com/article/us-russia-usa-whelan-pomeo/u-s-outraged-by-americans-espionage-conviction-in-russia-pompeo-idUSKBN23M1NA (last accessed May 19, 2023).

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER  2

public campaigns for Brittney Griner's release by the Women's National Basketball Association and other groups demonstrated, public perception impacts those high-level, political negotiations. If Mr. Vinnik were traded, this case would end, directly implicating defense counsel's ethical obligation to defend him in this case and zealously advocate for Mr. Vinnik's best interests. The defense cannot effectively do so under the current terms of the protective order.

This case itself is also a matter of public interest that has garnered local, national, and international attention, separate and apart from the prisoner swap discussions. Notably, the United States elected to unseal its allegations against Mr. Vinnik, and issue press releases trumpeting the prosecution of Mr. Vinnik, and it remains free to speak publicly about the matter—publicly or with any third party—whenever it suits the federal government's purposes. Yet, Mr. Vinnik and the defense team are unilaterally gagged by the protective order for no discernible reason. In a free country, when the government publicly initiates criminal proceedings, the defendant should be permitted to discuss the evidence with his family and advisors and publicly respond to the allegations if he so chooses, absent some compelling justification for secrecy. Here, there is none. Instead, it appears most likely that the Department of Justice opposes permitting Mr. Vinnik to discuss the case because it opposes prisoner swaps and does not want to see him returned to Russia.

Finally, and as a further indication that the secretive sweep of the protective order is unwarranted, the vast majority of written discovery is not subject to a designation as "Sensitive Information" under the protective order, and thus can already be publicly filed on the docket without any sealing.[2] Given that it is undisputed that no harm could come from public disclosure of the vast majority of the evidence in this case, the United States cannot possibly identify any "good cause" for the restrictions imposed on Mr. Vinnik and the defense team, as Federal Rule of Criminal Procedure 16(d)(1) requires. Mr. Vinnik therefore respectfully requests that the Court amend the protective order as noted in the attached proposed order. *See* Rizk Decl., Ex. A (proposed amended protective order).

---

[2] "Sensitive Information" is defined in the protective order as covering personally identifying information, financial information, as well as information that would reveal confidential sources, surveillance techniques, additional targets, etc.

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER        3

## II. BACKGROUND

### A. Mr. Vinnik's ordeal over the last five years.

In 2016, Alexander Vinnik was charged by the United States with operating an unlicensed money service business, conspiracy to commit money laundering, money laundering, and unlawful monetary transactions. For reasons that are not clear to the defense, portions of the docket including the Superseding Indictment remain under seal; however, the United States Attorney's Office has elected to release publicly the Superseding Indictment after Mr. Vinnik was arrested in Greece in July 2017. Rizk Decl., Ex. B (Department of Justice press release) & C (government-redacted Superseding Indictment). At that time, no less than eight senior law enforcement officials—including the U.S. Attorney, the Acting Assistant Attorney General, the Acting Executive Director of Homeland Security Investigations, the chief of Criminal Investigations for the Internal Revenue Service, the Special Agent in Charge of the United States Secret Service, the Special Agent in Charge of the FBI's Louisville Division, the Inspector General of the Federal Deposit Insurance Corporation, and the Acting Director of the U.S. Department of the Treasury's Financial Crimes Enforcement Network—all decided to make public statements about the case and Mr. Vinnik. *Id.* Ex. B. The government's press release contains paragraph after paragraph of detailed allegations of wrongdoing as to Mr. Vinnik and the defunct cryptocurrency exchange BTC-e that is nominally a corporate co-defendant in the case. *Id.* The press release also links to the Superseding Indictment. *Id.*

After Mr. Vinnik's July 2017 arrest in Greece at the request of American authorities, the Russian government filed a competing extradition request for Mr. Vinnik in September 2017.[3] While in Greek custody, Mr. Vinnik was the target of an assassination effort disclosed by Greek authorities. In an apparent effort to resist the Russian extradition request, the United States disclosed evidence concerning Mr. Vinnik to French authorities, who initiated a criminal prosecution of him and filed a third competing extradition request in June 2018. In November 2018, Mr. Vinnik undertook a hunger

---

[3] *See generally* Osato Avan-Nomayo, "Alexander Vinnik Claims Injustice While Now Fighting Charges in France," *Cointelegraph*, Feb. 7, 2020, *available at* https://cointelegraph.com/news/alexander-vinnik-claims-injustice-while-now-fighting-charges-in-france (last accessed May 19, 2023).

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER                 4

strike to protest his prolonged detention in intolerable conditions. Following intense lobbying, the Greek Minister of Justice approved Mr. Vinnik's extradition to France instead of the Russia. Mr. Vinnik ultimately spent approximately 30 months in Greek custody, from July 2017 to December 2019. In France, Mr. Vinnik was held in solitary confinement. Mr. Vinnik pled not guilty and elected to go to trial in Paris, which prominently featured evidence furnished by the United States. The trial resulted in Mr. Vinnik's acquittal on the majority of charges related to criminal conspiracy and extortion. He was convicted of a money laundering charge and sentenced to five years in prison in 2020—considerably less than the decade-long prison sentence French authorities had sought. Since his arrest, Mr. Vinnik has been unable to see his family. Mr. Vinnik's wife Alexandra was diagnosed with cancer and died in November 2020. His request to attend her funeral was denied. After service of his sentence in France, Mr. Vinnik was returned to Greece, where he again went on a hunger strike. Before his attorneys could file an asylum request with Greek authorities on humanitarian grounds, the United States succeeded in having him extradited to the United States in August 2022 on the instant Superseding Indictment.[4] When Mr. Vinnik was extradited, the Department of Justice again elected to issue a press release featuring various accusations against Mr. Vinnik and statements by the Assistant Attorney General for the Criminal Division. Rizk Decl., Ex. D.

      After his initial appearance in this district, Mr. Vinnik's French counsel publicly called for him to be traded to Russia in exchange for Ms. Griner. The Department of Justice attempted to intervene by requesting, without any legal basis, that any communications with the United States government on behalf of Mr. Vinnik be relayed through undersigned counsel to government counsel of record in this case, although the line prosecutors had no decision-making authority or information about the swap negotiations. The decision to trade a prisoner rests with the President, who receives advice from the State Department, Intelligence Community, and Department of Justice, among others. Subsequently, the United States contacted defense counsel to ascertain whether Mr. Vinnik in fact desired to be traded

---

[4] Greece refused to extradite Mr. Vinnik to face prosecution on Count 1, and the United States concedes that it cannot proceed on that charge.

(which he does). Defense counsel was informed that the United States offered to trade Mr. Vinnik to Russia in exchange for Ms. Griner, but the exchange took a different turn. Mr. Vinnik remains a loyal and devoted family man, but he was happy to hear that Ms. Griner was returned home.

During the pendency of this case, Mr. Vinnik has been in contact with Russian consular officials, who (like U.S. officials abroad) and closely following developments in the case. In November 2022, Mr. Vinnik was personally visited by the Russian foreign minister at Santa Rita Jail. Defense counsel sought, and the Court granted, an order prohibiting American government agencies from monitoring the jail visit. Throughout this period and continuing to the present, numerous reporters from local, national, and international media outlets have sought comment from Mr. Vinnik and the defense team concerning Mr. Vinnik's ordeal, the case against him here, and the prospects for a prisoner swap. The news media as well as members of the public who contacted the defense team were particularly interested in learning about the specific accusations and evidence against Mr. Vinnik, as compared to other candidates under reportedly consideration for a swap. To date, hundreds of articles have been written about Mr. Vinnik since his arrest covering virtually every stage of his long legal ordeal. The public unquestionably has a strong interest in learning about this case.

Public interest in Mr. Vinnik remains acute even after the trade of Russian arms trafficker Viktor Bout for Ms. Griner in December 2022. Today, American Paul Whelan is still in custody in Russia since the United States did not secure his release along with Ms. Griner; and in March 2023, Russia arrested *Wall Street Journal* reporter Evan Gershkovich on espionage charges. Almost immediately, both Russian and American officials indicated that a possible prisoner swap was under consideration again.[5] Discussion between the two countries are ongoing. Numerous individuals with knowledge of prisoner swap negotiations have informed defense counsel that it is important that Mr. Vinnik and his defense team advocate publicly for his inclusion in a trade in order to maximize the chances of such an

---

[5] "Russia may consider prisoner swap after trial of detained U.S. reporter," *Associated Press*, Apr. 13, 2023, *available at* https://apnews.com/article/russia-detained-wall-street-journal-reporter-d3a51b09c1db6b1d5b8012367bff51c4 (last accessed May 19, 2023).

U.S. v. Vinnik, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER                 6

exchange.[6] Rizk Decl. ¶ 8.

Apart from the public's intense interest and right to know about these public proceedings, Mr. Vinnik has a strong personal interest in vindicating his right to discuss the evidence in this case with those who are close to him. Prior to his extradition, Mr. Vinnik had never traveled to the United States in his life and had no friends or family in this country. Due to the severe conditions of his prolonged detention for years and the language barrier he faces in custody at Santa Rita Jail, Mr. Vinnik is extremely isolated. The terms of the protective order arguably prevent him from discussing any and all of the evidence in the case with his own family—an extremely draconian restriction that is inhumane and well outside the norm of criminal practice in this district. Likewise, Mr. Vinnik, a deeply faithful man, is unable to seek the guidance of a local Russian Orthodox priest who has offered Mr. Vinnik spiritual support.

### B. The terms of the existing protective order.

The United States proposed the first draft of the existing protective order in this matter. When the defense met and conferred with the government, the defense objected to various terms in the draft, including those at issue here, and asked that they be removed. The two specific provisions at issue are as follows:

1. All materials provided by the United States in preparation for, or in connection with, any stage of this case (collectively, "the materials") may be used by the defendant and defense counsel solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without further order of this Court.

2. Neither the defendant nor any member of the Defense Team shall provide any discovery material produced by the government—whether or not the material constitutes or contains Sensitive Information within the meaning of this Order—to any third party (i.e., any person who is not a member of the Defense Team) or make any public disclosure of the same, other than in a court filing, without the government's express written permission or further order of this Court, except that the Defense Team may show discovery materials produced by the government to witnesses in the course of preparing a defense for trial or any related proceedings in this case, but only if (i) the witness, by reason of their participation in the underlying events or conduct, would have seen or had reason to know such information, or

---

[6] For this reason, and as defense counsel explained at the December 2022 status hearing when this issue was last addressed, the Court's prior order allowing the defense to provide discovery materials to the State Department does not address the full problem raised herein. *See* Dkt. No. 39.

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER   7

(ii) it is otherwise relevant to the defense of the case that the Defense Team discuss with or show the witness the materials.

Dkt. No. 29 at ¶¶ 2-3. Neither of these restrictions are customary in this district or included in the model protective orders posted on the Court's website.

When the government refused to remove the restrictions, the defense repeatedly pressed government counsel at least three or four times in writing and in discussion to justify the restrictions. *See* Rizk Decl. ¶ 9. For example, in the first exchange of drafts on September 13, 2022, defense counsel cut the first restriction and included a comment: "What is the justification for this restriction, which is not usually adopted in this district?" *Id.* Ex. E. Then again on September 20, 2022, undersigned counsel wrote to the government concerning the restriction: "I am concerned that we are going to have a dispute around paragraph 2, so I would like to know what the justification for it is." *Id.* Ex. F. The only response the government ever provided in writing was: "This matter is unique enough to justify additional protections." Rizk Decl. Ex. G. In discussion, however, the line prosecutors conceded they were "not authorized" to make the changes requested by the defense. *Id.* ¶ 9.

To avoid further delays in receiving discovery, the defense opted to accept the restriction temporarily, but did so subject to Mr. Vinnik's objection and warned the government that the defense would likely move to modify the protective order pursuant to its own terms: *Id.* Ex. I ("I still do not think the paragraph 2 restriction has been justified by any articulated reason, but I will agree to this draft in order to obtain the discovery. If I receive discovery that I want to use for some other purpose (such as other litigation) then I will move to modify the PO under paragraph 12."). Notably, paragraph 13 (formerly paragraph 12) of the protective order expressly permits such modifications: "This stipulation is without prejudice to either party applying to the Court to modify the terms of any protective order." Dkt. No. 29 at ¶ 13. Unfortunately, defense counsel's offer to accept the protective order subject to objection did not result in prompt production of discovery by the government and instead Mr. Vinnik was obliged to obtain a discovery deadline to compel the government to meet its discovery obligations in a reasonably timely fashion. *See* Dkt. No. 40 (Minute Order setting discovery deadline of Feb. 14, 2023).

### III.  ARGUMENT

####   A.  Legal standard.

Federal Rule of Criminal Procedure 16(d)(1), which governs protective orders, provides: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." The government bears the burden of showing good cause for any restrictive term it seeks in a protective order. *See United States v. Calderon*, No. CR14-103-CAS, 2014 WL 1401941, at *3 (C.D. Cal. Apr. 8, 2014) ("[T]he government must set forth good cause to obtain a protective order[.]"); Fed. R. Crim. P. 16(d)(1) ("[T]he court may, *for good cause*, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." (emphasis added)). Good cause requires "a showing that disclosure will work a clearly defined and serious injury[.]" *United States v. Wecht*, 484 F.3d 194, 211 (3d Cir. 2007), *as amended* (July 2, 2007); *see also United States v. Bundy*, No. 2:16-CR-046-GMN-PAL, 2016 WL 7030431, at *3 (D. Nev. Nov. 30, 2016) ("Good cause exists when a party shows that disclosure will result in a clearly defined, specific and serious injury." (internal quotation marks omitted)). Additionally, the terms of a protective order may not be so restrictive as to deny "an accused's constitutional right to the effective assistance of counsel in criminal prosecutions." *United States v. Torres*, No. 20-CR-00418, 2020 WL 4500046, at *4 (D.N.J. Aug. 5, 2020); *see also United States v. Mills*, 641 F.2d 785, 788 (9th Cir. 1981) ("[T]he ability of an accused to prepare his defense is a fundamental aspect of our adversary system[.]").

Notably, the public's right of access also attaches to certain classes of documents contained within discovery. First, the public enjoys "a common law right 'to inspect and copy public records and documents, including judicial records and documents,'" such as post-indictment government filings, search warrant applications, court order, and attachments. *United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont.*, 658 F.3d 1188, 1192 (9th Cir. 2011) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted)). Second, there is a recognized "'First Amendment right of access to criminal proceedings' and documents therein." *Id.* (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986)).

**B.    The challenged protective order restrictions are unjustifiable and nonsensical.**

The central question raised by this motion is, why is the government seeking to impose an extraordinary level of secrecy over the handling of all discovery in this case—even as to materials that are not sensitive in any way and disclosure of which would do no harm? That is true for the vast majority of written discovery produced in this case by the government. A rough estimate based on the volume of discovery is that less than one-fiftieth (1/50) of it has been designated "Sensitive Information" by the government. Rizk Decl. ¶ 10. None of that sensitive discovery is at issue in this motion. The remaining non-designated discovery—including for example law enforcement reports of investigation (ROIs) that date back many years, search warrant applications, affidavits, attachments, and orders, business records of various enterprises that went defunct many years ago, sundry correspondence and photographs, evidence of blockchain transactions that are already public, and even articles from the news media—has no conceivable sensitivity or confidentiality that should attach to it.

Indeed, all of these voluminous materials may be filed on the public docket in this case without sealing under the terms of the existing protective order. For example, nothing restricts the defense from attaching reports of investigation to this pleading. *See, e.g.,* Rizk Decl. Ex. H (July 9, 2018 H.S.I. Report of Investigation). Once filed, qualified common law and constitutional rights of access attach to the documents under the Supreme Court's precedents noted above, given the public's right to be informed of criminal pretrial proceedings and related filings. *Battlefield,* 658 F.3d at 1192. The current confidentiality scheme in this case thus makes no sense. If there is indisputably no injury that could result from public disclosure of these materials and they may be publicly disclosed in litigation, then there is no conceivable "good cause" under Rule 16 for restrictions that preclude the defense team from publicly disclosing information where it is obviously in Mr. Vinnik legal interest to do so.

To be clear, the defense has no intention of posting all of discovery online just to prove a point—a fear expressed by government counsel that has already been allayed by the defense. Undersigned defense counsel is an officer of the court and would not engage in that kind of conduct. However, under the current confidentiality regime there is virtually no circumstance whatsoever in which the defense

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER             10

can even draw upon the *information in discovery*—separate and apart from disclosing the documents themselves—except when conducting investigation or filing formal submissions before the Court. Such restriction is nonsensical and fundamentally unfair. The defense should be permitted to use and disclose non-sensitive discovery when necessary to advance Mr. Vinnik's legal interests absent "good cause" furnished by the government.

For one, Mr. Vinnik should be permitted to use discovery that is indisputably non-sensitive to answer the accusations against him and advocate publicly for his inclusion in a prisoner swap. An exchange for Mr. Vinnik would put an end to this prosecution and moot any potential punishment, just as it did for Mr. Bout when he was swapped for Ms. Griner. The California Rules of Professional Conduct affirmatively require defense counsel to "act[] with commitment and dedication to the interests of the client" and not to "neglect or disregard" the client's interests. *See* Cal. Rule of Prof'l Conduct 1.3 (Diligence). Notably, the American Bar Association Model Rules go even further. They require that:

> A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause of endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.

*See* American Bar Association Model Rule 1.3 (Diligence). This professional ethical obligation extends to publicly advocating for the swap, especially given the stakes for Mr. Vinnik, who the government contends could otherwise be facing what would effectively be a life sentence in an American prison, far from his family and his community in Russia. Foregoing such advocacy would fall short of professional standards. Contrary to the ethical rules, the prosecution wishes Mr. Vinnik and his counsel to direct all of his advocacy concerning a possible prisoner exchange to the Department of Justice, an agency that is hostile to any trade due to its own bureaucratic interests. But that is not how government agencies are influenced in a free country on matters that concern foreign policy and personal liberty. Instead— thankfully—even criminal defendants in this country are (and should be) permitted to defend themselves and advocate publicly for their interests to anyone who is willing to listen, including other agencies in government, the news media, and the public itself.

Further demonstrating the inequity of the unilateral restrictions on the defense imposed by the

protective order, the government itself has not abided by the confidentiality obligations it seeks to enforce against Mr. Vinnik. To the contrary, the United States intentionally availed itself of publicity when it chose to make public allegations against Mr. Vinnik. Starting back in 2017, the United States purposely issued press releases and publicized the accusations against him, both when he was arrested and then again when he was extradited here. The U.S. Attorney's Office even released the Superseding Indictment publicly on its website, although the charging document apparently remains under seal on the Court's docket. Going further, the United States elected to disclose evidence concerning BTC-e and Mr. Vinnik to French and Greek authorities in order to facilitate his prolonged and unusual extradition and detention in Greece and then his prosecution in Paris.[7]

      The point is made even more personally as the restrictions pertain to Mr. Vinnik and his family, his priest, and consular officials from his country. It is a very rare case in which the government prevails in preventing a defendant from communicating about his situation in meaningful detail with his family. Indeed, even in cases where family members are co-defendants, conversation is typically allowed in the presence of defense counsel. Here, the protective order flatly forbids Mr. Vinnik from discussing the evidence against him with his mother and his brother and other relatives. The result is unconscionable. Equally, it is difficult to conceive of any justification that can be raised to forbid Mr. Vinnik from seeking counsel from a Russian Orthodox priest, who is his only spiritual guide in this country. Doubtless, the United States is deeply suspicious of the attention that Russian consular officials have devoted to Mr. Vinnik's case and the government will almost certainly raise a host of objections to their access to evidence and proceedings in response to the instant motion to ease the protective order's restrictions. The context and irony of the government's position is hard to overlook; consider, for example, United States' public protestations concerning secrecy in proceedings abroad. There are many significant differences between the legal system in the United States and Russia—and

---

[7] The defense does not, with this motion, challenge the government's right to provide information to other countries in the course of criminal investigations. Rather, it highlights the United States' actions in this particularly unusual case to show the inconsistency and hypocrisy of the federal government's preference that Mr. Vinnik remain silenced while it speaks freely about the case.

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER      12

plenty of nuance involved in complex cases—but unjustified secrecy is a serious and legitimate concern of every criminal defendant, and especially in the present circumstances. American law and courts promise an independent check against the federal government's bureaucratic tendencies.

The defense invites the government to justify under Rule 16 the extraordinary and unwarranted silence it seeks to impose on the Mr. Vinnik with the existing protective order and submits to the Court that it cannot in fact do so.

### IV.     CONCLUSION

Mr. Vinnik respectfully requests that the Court amend the protective order to strike the objectionable restrictions challenged, as set forth in the attached proposed amended protective order (Rizk Decl., Ex. A).

|  |  |
|---|---|
| Dated:     May 19, 2023 | Respectfully submitted, |
|  | JODI LINKER<br>Federal Public Defender<br>Northern District of California |
|  | _____/S_____<br>DAVID W. RIZK<br>Assistant Federal Public Defender |

*U.S. v. Vinnik*, Case No. 16-CR-00227 SI
MOT. TO AMEND PROTECTIVE ORDER              13